Second and last case of the day. Belegas or Bejegas if you go by the golfer Camilo Bejegas versus Attorney General number 09-1271. Mr. Ryder and Mr. Hurt. His brother is in the tournament today. He's at minus one. Yeah. Wow. That's some family, huh? Good morning. My name is Mark Ryder. I am here on behalf of Igor, I think it's Belegas, and his wife and two children who were applicants for asylum withholding of removal and CAT. I'd like to request first, I actually asked for three minutes initially, but if I could change that to five minutes of rebuttal. Can I ask you a non-substantive thing before you start? Sure. Is Milagros' name with two L's or one L? Because one of us is going to have to write an opinion in this case. It appears both ways. We want to get it right. I'm actually not, I think it's two L's, but I'd have to double check that. Okay. Where does it appear? Why don't you check, you can let us know when you have it, sir. Okay. I have receipt notices here. First of all, a lot of time has been spent in my brief and my adversary's brief and actually in the BIA's opinion on whether or not what happened to the Belegas' constitutes past persecution. When I look back over the immigration judge's opinion last night, first of all, I saw again that she did not address past persecution, which the BIA pointed out and addressed, but also that the grant of withholding of removal in this case was really based on the uncontradicted evidence and credible testimony of both Mr. Belegas and his wife, that Mr. Belegas was a very active member of the Democratic Action Party in Venezuela, active to the point where he was in control of part of Caracas, in control of 250 people. He was out there handing out leaflets, organizing, and organizing opposition to Hugo Chavez. So we have that. Secondly, what we have, and the judge pointed out, is there was an article that was entered into evidence put out by the Bureau of Democracy and Human Rights, which addresses treatment in part of opposition members of Hugo Chavez. And it is undoubted, and the evidence is overwhelming, that opposition, including community leaders, not only political leaders of the party, but also community leaders, are persecuted. One of the things that may have influenced the decision here, at least as to the BIA, is you have a person who comes here in what, 2002? 2001. 2001. Right at the end of 2001. And did not apply for asylum. Applied for what? Well, when he initially came, he met with another attorney, not myself, Alan Gallimore, H-1B. Right. And that's not asylum. And he said that he intended to go back at some point, did he not? Well, what he said was in a fax, and this was actually never addressed in any of the testimony. It was a fax that was entered into evidence concerning the one-year issue. There was a fax to his prior attorney that said, what is going on with my H-1B visa? I've been waiting, I've been waiting. And I think the words were, my chief wants me to go back to Venezuela. Now, that was never examined in testimony either by me or by the government's attorney or really by the judge. It suddenly came up to my memory in the judge's decision. He did testify that when he, I believe he testified that when he came here, what he knew about was the H-1B. He did not know about asylum, and he was looking for a way to stay here. He was researching on the computer, and he saw, because he had a university degree, he saw that an H-1B would be a way for him to stay here, and that's why he initially pursued the H-1B. He did apply for asylum almost three years after getting here, but the evidence also shows that about a year into the process or a year and a half into the process with Mr. Gallimore, he brought up the fact that he was afraid to go back home, and that's why he really wanted the H-1B. The judge does actually not address that, and also the BIA doesn't address that in their decision. There's also a case law, which neither of us cited in our brief, that says even if an alien returns to the country from which they're claiming asylum, that does not necessarily destroy their asylum claim. We don't know, because there was no testimony about it, why he wrote that sentence in the letter to Alan Gallimore. It could have been for a variety of reasons that I could think of, maybe to get the attorney to speed up and get his visa issued. I mean, we don't know, because nobody ever asked him, why did you write that line? There are other statements, or at least in the statement in support of the asylum application, where he clearly states that he was fearful of going home, but the fact is I don't know if his subjective fear is, while it's relevant, with a withholding or removal claim, it's more of an objective standard. Is he more likely than not to be persecuted if he returns to his country? Well, in addition to what Judge Ambrose said, I mean, it's been over nine years now since all this happened. I mean, they have family there. There's no evidence that the family's been harassed or threatened in any way. I mean, hasn't the smoke blown over? Well, no. Actually, I checked the country reports for Venezuela on the train this morning, just to double check, and it says that, well, obviously, Hugo Chavez is still in power, and there are still a lot of incidents of opposition members, and not only the leaders of the party, but people who are against Chavez being kidnapped, threatened, and killed. But based on what we have in the record, isn't Judge Chigueras right on point? Well, you know, the family members, I can address that. I mean, there's unfortunate events happening all over the world. We're not going to take judicial notice of that. Right. Well, my point is because even though the nine years have passed, the situation there is still – it's probably worse than it was when he left. But also to address the family member question, he is – They oppose Chavez as well. I mean, just – right? I mean, they're also – His family members did. His family members, some of them are members of the Democratic Action Party. But the case law – and I think the case is Lee, L-I-E. What about the facts? The point here is they've been left alone. Other family members are still there. They're members of DAP, and nothing's happened to them. And the only thing that I could see in the most recent reports is that, yes, there are, quote, increasing tensions, close quote. But how does that – how does that enough to create a clear probability of further persecution when other family members belonging to DAP are not being persecuted? Well, he is different than the other family members. The BIA acknowledged that, but I don't think they acknowledged how different he is and how much more active he is. His wife said that when she was younger – well, she's here, so that doesn't matter. But his parents, I think, and a sibling, they're members, but they were not out there in Caracas in charge of 250 people organizing things at work, going out and handing out leaflets. But isn't the argument that if he was so active and so much a target, that likewise the family would be subject to ridicule, danger, et cetera? Not necessarily. I think that's what I was – I think it's the matter – it's Lee, L-I-E, that says just because family members remain behind and are not persecuted, that doesn't necessarily mean that this person, based on their individual activities – and it might also be – when I read the state report last night, it says that people who are known leaders, it didn't mention that their families are also persecuted. In the report that I read last night, it said the leaders are persecuted. Well, it's not dispositive, but it's certainly a factor for us to take into account. Yeah, I acknowledge that. You said a few times – and I could be wrong, and maybe you can clarify this – you said he was the leader of these 250 people? He was. He was active, but isn't that an overstatement? No, I believe that in his testimony, if I can get to it, he said that he had 250 people under him, although that may have been a misstatement. I think it might have been 250 people under him at CAN TV, where he worked, where he also organized – he also organized opposition events. But not all those 250 people, then, if you're talking about the TV, they weren't all opposition. That was a mistake. That was – my memory is incorrect. But I do know that he was in control of a portion of Caracas, like a certain northeast, or I forget exactly what it was, and I'd have to dig through to find his – Okay. But he was more than just a card-carrying member of the Democratic Action Party or somebody who just belongs and every once in a while goes to a meeting. He was certainly active. What specifically are you challenging? Are you challenging the fact-finding, that is, what happened, or are you challenging whether what happened amounts to persecution? I am challenging the second, the latter, which is, first of all, that the – well, part of the fact-finding as well, if you include the kidnapping, I think there's no doubt because there was a dispute. The immigration judge found that the kidnapping incident was fabricated. I think that that determination was not supported by the evidence of record. Yeah, but the BIA didn't go off on that. They sort of just – That's another thing. The BIA never addressed – Well, that was helpful. I mean, they basically said, we're not going to say necessarily that that was any type of adverse credibility determination. But in terms of what happened here, it does not amount to persecution. Well, I believe that the case law, if you look at Lee and Chavarria – Chavarria. Chavarria, I'm sorry. You have threats here, death threats, accumulating over many months, and you also have physical damage to his car. That in and of itself might – it's questionable whether that's enough or not. But when you include the kidnapping in there, even though the kidnapping was not successful, then I believe it arises to persecution. But even if we have no past persecution, we can still prove withholding because of his – that's more probable than not that he – or more likely than not that he's going to be persecuted. And I think that his active membership – and this is what the judge found – his active membership in the Democratic Action Party and the country conditions make it. But I think that – I also cited Delgado, and I know my adversary says that that case is distinguishable. I think it's an 11th Circuit case. I decided that for the proposition that kidnapping can be considered, and also the BIA has said that can be, depending on the circumstances. There's a certain number of cases. I noticed that the BIA, when it sent it back to the IJ, it was for the purpose of considering also whether that can be voluntary departure. That's right. That's somewhat unusual for the BIA to do that. Do you know why it was done here? I mean, I can understand why you want voluntary departure, but – I actually don't know why it was – Is there a chance that there's another country they can go to besides Venezuela? Not that I know of, no. I have no other countries that they can relocate to. And I also did not, to my memory, request voluntary departure in an alternative. It just suddenly came from the BIA, the remand, to the immigration judge to grant voluntary departure. So that was sort of surprising, yes. Okay. Thank you. We'll hear from Mr. Berg. Good morning, Your Honors. May it please the Court. My name is Ted Hurt on behalf of the Respondent Attorney General. I think the central issue before the Court this morning is really Mr. Villegas has demonstrated a clear probability, in other words, it is more likely than not, that if he returns to Venezuela in, let's say, 2010, over nine years, I think, or at least eight years after the last incidents that prompted him to claim he left for this country. Has he demonstrated that in view of the objective evidence and in view of the country conditions evidence? I'd like to go a bit out of order and address the country conditions evidence first, in part because Mr. Ryder has put some great emphasis on it, which I did not see in his opening brief. First point I want to make. Although country conditions are something that we often can't consider, and they often come in, since they're State Department documents, they do come in sometimes. Oh, yes, Your Honor. And, in fact, the two points I want to emphasize this morning in terms of country conditions evidence are actually maybe a minor point, which is that at least when I consulted this Court's Wong opinion, in the Wong opinion this Court examined some country conditions report that were not in the record and acknowledged that it was going outside the record to, in a sense, confirm its understanding of what was in the record. I have not tried to talk about the most recent report, which obviously Mr. Ryder addressed. However, I do want to talk about the country conditions evidence that was in the record because I think that one of the central points on which the immigration judge relied was this issues paper from the State Department. And the two very interesting things about the report are the headlines, issues report, harassment of the opposition in Venezuela. What is conspicuous about this report and why I believe that the Board of Immigration Appeals was quite correct in reversing this aspect of the immigration judge's decision is that there's very thin, very thin evidence here that would link what happened to people in Venezuela during this time period with Mr. Villegas' fear of going back. Now, why do I say that? One of the conspicuous things, and I'm quoting from the record at page 491, the headline, Chavistas and the waning influence of Bolivarian circles. The waning influence. Now, ironically, when the immigration judge's opinion is typed up, at one point it's called waning, R-E-I-G-N-I-N-G. That's clearly a typo. And in another, on 226 of the record, it's waning, W-E-H-I-N. That almost asks us to send it back for some sort of further fact-finding because if it's waning, is somebody taking its place? Would there be other folks from the Chavez regime that might necessarily want to come after them? I don't know if that means much to us at this point. Well, I think the lesson I want to draw from, I hope we could draw from the citation of the immigration judge to this portion of the record, is that the immigration judge, in her opinion, I want to be fair to her on this, actually does recite the waning influence. She does use the term correctly, the waning influence of these Bolivarian circles. And I think the second thing that's conspicuous about this report is she In contrast, what is not in the report, maybe what is more important is not in that report, and indeed it's not in the 2006 country report, is a showing that Chavez supporters have targeted action, Democratic Action Party leaders for assassination or kidnapping. And that is really Mr. Villegas' claim. The death threats occur. You're saying just because they don't name the party itself that that's evidential? I mean, isn't there evidence in there about harassing opposition just generally? I agree, Judge Chigaris, that there is ongoing intimidation and harassment of people who are perceived as opponents of the Chavez regime. But I guess I would come back to the point, which is in some of the decisions that we've cited from this Court, decisions like the Lee case, for example, when Lee cites Boykoff, when the Lee case cites the Lim case from the Ninth Circuit, there will always be, unfortunately, threats in regimes like this to opponents, and indeed death threats. But where we have to decide, do those cross the line? And I think that the decisions that the Board relied upon, and I don't know if I will pronounce it correctly, Shavaria, basically how imminent and menacing are those death threats? And I think that when the Board looked at the withholding ruling that's at issue here today, it had about four reasons as to why Mr. Boykoff did not stand up. One was his delay in seeking asylum. The Court has noted that. Second, he writes a letter to his attorney that basically says in 2002, my boss wants me to go back to Venezuela to do business. Well, a letter like that is wholly inconsistent with a man who claims that if he goes back to his home country, the Bolivarian circles will be waiting for him. You could probably flip that around and say, my boss wants me to go back. Please hurry up and work on the thing that you're supposed to be working on for this country. Well, Your Honor, I mean, I acknowledge that one can draw an opposite inference, but the fact that one can draw either inference suggests to me that this is not a man who about a year after he's come to this country is basically, what if his boss tells him to go back to Venezuela? Now he's going to say, oh, I'm sorry, I got a visa under the representation that I will go back to Venezuela, but now I'm afraid to go. That's not going to look very good. So I guess the other point I want to make is certainly we've talked about a little bit the family members in Venezuela. Now, I'm not contending here that they are as active as the father here. Certainly we know that he was an organizer, and I think Mr. Reiter has correctly clarified that we really don't know how much he, quote, was in charge of anything. And I think, you know, the Court should look at the record and the transcript for that. I'm not disputing that he was an activist. But the alleged threats directed at the family were directed at them. And his sister writes a letter, after all, that says there are cars, mysterious cars circling her area. But, again, what's the absence of evidence? There is no evidence in the transcript that any member of the wife's family, any member of the husband's family experienced any direct threat, a death note, a threat, something mysterious, a crime that maybe was something more. Nothing. The record is totally silent. And, indeed, one of his uncles, and this is at 923 of the record, in his asylum application, Mr. Villegas makes a big point, that one of his uncles was a prominent opponent and, in fact, had served in the prior regime. So nothing against him either. So I think that we've got a lot of indicia that support the Board's conclusion that this is not a claim for withholding. Another example, he claims that a number of his co-workers who were supporters of the Democratic Action Party received threatening notes, received threatening calls. Again, a silent record. There's no indication in this record that any of his co-workers experienced any problems. Now, I cannot tell from Mr. Ryder's presentation whether he is arguing before the Court that we need to take on the issue of whether the attempted kidnapping constituted sufficient persecution to support his withholding claim. And, certainly, if the Court wants to go into that, I'm very happy to do so, because I think certainly that's not something. Part of the problem that I have is when you look at the last page of the BIA's opinion, and it talks about the possibility of further persecution, is it making a legal determination there based on the facts that were found by the IJ, or is it basically doing something else? I'm reading it, and I can't be sure. Well, Your Honor, I guess I would start with a threshold point, which is maybe from the prior page of the decision, which is that the Board is very clear, and we've noted this in our brief, that the Board is applying the clearly erroneous test. And it's not disturbing the credibility findings, but it is definitely reversing the merits finding as to whether Mr. Villegas has proven – Past persecution. That's right, Your Honor. There are two holdings. We find that these threats that I've just talked about, the threatening notes, are insufficient under the case law, and now we go to point two, which is even if this attempted kidnapping attempt occurred, it also does not constitute persecution and certainly would not support the withholding claim. So I think that the Board is really looking, as it can do, under the clearly erroneous – Was it taking the facts found by the IJ and saying that they were clearly erroneous, or was it accepting those facts and saying that as a matter of law, this does not constitute past persecution? We'll come to future persecution in a minute. Well, certainly the – certainly I think the Board, on this last page, is accepting the rendition of the threats that the immigration judge credited, at least implicitly, because the immigration judge before talks about the tensions article combines that with the threat. So I think the Board is taking that. There's no dispute, at least, putting aside what they mean. I think that the facts are, are these threats sufficient, and are they counterbalanced by this other evidence, which is, in my view, very compelling. But I think that the Board is not disagreeing in that respect, but the conclusions that one is going to draw from these facts, I think that's clearly erroneous under the Board's formulation, which I think is familiar to this Court. A clear and definite mistake has been made, a clear and definite view that a mistake has been made in assessing and analyzing these facts. And I think that – Wait a minute. Now, the assessing of facts is what you do when you look at whether there has been past persecution. That's why I'm asking the question. I see. I mean, are you saying that the facts found by the IJ were – some of the facts found by the IJ were with the exclusion of the adverse credibility determination. Any other fact was found to be clearly erroneous? Well, I'm not – I'm not – maybe I'm misunderstanding the Court. I'm not thinking that the Board is saying we think that you found fact A, fact A does not exist, it's fact B, the event didn't occur. I think it's – I think what the Board is doing, it's assessing the implications of those facts, and I think it's deciding do these constitute persecution for the purposes of a withholding of removal claim. And I think that's well within its authority, certainly. No, that's clearly what it can do. Excuse me? That's clearly what it can do. Yes, I think that's what it's doing. That's a matter of law. I just was unclear as to what you were saying. Oh, I'm sorry. But I think coming back to the kidnapping issue, I think that there is a spectrum of decisions here, and it seems to me that the Gomez case, which is certainly well known to this Court, is sort of the example of why this alleged attempt at kidnapping did not reach that line. After all, in the Gomez case, that alien was subjected, if you look at the facts, to two abductions prior to the eight-day abduction that this Court determined to constitute a valid persecution claim. The first incident, she was taken out of her village, marched forcibly with other women and told, please, you know, do not fraternize with the military. Another event, she's taken out a second time and said the same thing. The Court acknowledged that those cases were close to the line. Those incidents were close to the line. It was that eight-day abduction in which there was basically terror imparted that the Court found that persecution did occur. The Shavaria case, I would say, is the same thing. There is a man who was threatened several occasions, but what turned the case perhaps into a case that supported a claim of persecution was men cutting off his car, forcing him into the back of the car and holding guns to his head and stomach and robbing him. So I think that, again, we come back to the contrast in Case Lee, which is, again, a man who was threatened, and basically the factory officials say, if you do not go through with the sterilization policies, you will end up like this other gentleman who was severely beaten. And, of course, this Court relied on Boykin and the Lim case to say that, yes, threats are terrible, but unless they get to that menacing actual impact situation, they're not going to rise to the level of persecution. So assuming this attempted kidnapping occurred, it was a brief encounter. It was unfortunate, but we don't know what more to say about it, but it did not rise to that level of persecution. I think the final thing I'd like to come back to, unless the Court has a few more questions, is just to summarize a little bit more about the evidence. I think, again, the Board was relying on trying to determine what will happen to Mr. Vegas if he goes back to Venezuela. Now, he's not a high-level party official. He does not even identify himself as an official within the party. He's a local organizer. We don't know how much control he has outside of the people he organized within his telecom company. But, again, the State Department evidence, the 2005 report, the early reports do not show a pattern of Chavez regime supporters, circles, the other groups of assassination, kidnapping, political disappearances. It's simply not in the record. And we really can't make more out of it, and I think that was where the immigration judge really, she acknowledges, I'm giving you the benefit of the doubt. It's a close case, even for that immigration judge. And I think that was where the Board properly said, no, you've gone too far, in essence, because the evidence simply isn't there. And, again, if we go back to the problem that there's no showing of the family having been subjected to any harm or injury or threats in their home country. Thank you, Your Honor. Thank you very much. Mr. Ryder. I will try to go in the best order I can. First, as to the article which Mr. Hurt spoke about and the judge emphasized, if you look at page 492 of the record, it's a little bit more than that opposition members are harassed. It talks about intimidation, threats, attack, and in some cases even suffocation. So I think there's a little bit more there than just harassment. Does the report say that the Bolivian circles, their influence is waning? It does say that it's waning, and the judge acknowledges that, but that it was replaced, according to the judge, and this part I didn't find in the article yet, but according to the judge it's replaced by another group called the Chavistas. So the Bolivarian circles. What evidence do we have that that group creates any fear, danger for Villegas? Well, in the article it just says that the opposition is targeted by the Bolivarians or by, and I don't want to misquote this, but the Chavistas are sort of taking the place of the Bolivarians. I don't have the specific place in the article there, but the judge mentions it. I understand, but if we agree that the Bolivarian circles, their influence is waning and replaced by the Chavistas and there's no evidence in the record that the Chavistas, if I'm pronouncing it correctly, have any, don't have it in for, to use a colloquial phrase. Mr. Villegas, what are we to make of the article? Well, I would have to read, go back through the article quite honestly to see that, but I think there is still evidence that whoever it is, if you're in the opposition, that you're going to be targeted, and also I guess I would point out, and without reading specifics. Can you say something more specific? I can go to the page in the article. I also think that waning is a word that doesn't mean that they're still not persecuting people and going after people. Maybe their influence is waning and lessening, but that doesn't mean certainly that people are safe. I think that's one thing I was thinking as we sat there, and I'll look for this in the record as we talk. Another thing is the kidnapping incident. While I'm sort of focusing on the fact that he was a member of the Democratic Action Party and that there's evidence that that party is persecuted, as far as the past persecution, there is an argument here. I understand it's not the strongest case in the world, but if you look at the progression of the threats, the threats at work, threats at home, damage on two occasions to his car, the first occasion there's spray paint on his car saying you better support Chavez. The second time was basically death threats saying next time your car's going to end up in the parking lot of the dead. And then if you accept the kidnapping attempt, and I don't think the family should be penalized because the kidnappers were not successful in their kidnapping attempt. Who knows what would happen had they kidnapped him. Fortunately, there was a parent there who came to their aid with a gun and saved him, but who knows what would have happened. Based on those facts, I think you have, there is a strong argument for past persecution. Chavarria was really, I understand there were cars circling his house at one point, but it really came down to one incident. I understand he was put in a car and someone put a knife to his head and then a gun to his body, I believe. But that was one incident and that was it. He was not harmed beyond the fact that he was taken into the car and a gun put to his head, but physically he was not harmed and past persecution was found in that case. In Lee, which was the sterilization case, they were threatened with sterilization, but nothing happened after that. There's a little bit more in this case. One other thing I didn't mention, it's sort of important, maybe it's a matter of clarity of record here, but the Board of Immigration Appeals says that there are no derivative beneficiaries of withholding of removal, which is correct. And the Board says that we didn't file separate applications for the beneficiaries. That is not true. I do not have the complete administrative record here, but I can tell you at page 185 of the administrative record, the judge acknowledges that I believe that we filed the I-589s. I also have, which I could supplement the record, the receipt notice is from it, from the USCIS, but we did file those, and the judge, if you look in the record, at a master calendar hearing, a status hearing, said to us, look, you need to file separate applications for the wife and children. It's clear there are separate applications here. Okay. Also, as to the kidnapping incident, the judge, and I think there was clear error here with the judge saying that my clients fabricated the kidnapping incident. She based that finding on the fact, not that there were inconsistencies in their testimony, but on the fact that a letter that was obtained from the school official said or did not mention the kidnapping incident. But he still ruled in your favor. What's that? But the IJ still ruled in your favor. Still ruled in her favor, but I think the kidnapping incident is important. I understand she did rule in her favor, yes. But she may have made an error there because there's another letter from somebody from the Democratic Action Party which mentions the kidnapping incident, and also, by the way, mentions that other members of the Democratic Action Party had been threatened, had left the country, and that was the letter from Yelena, I'm not, Yelena Reyes is from the school. It was Eleanor Avella. So she has it in her letter for the judge to seize on the omission of the kidnapping incident in a letter from the school which the judge acknowledges she does not know what the nature of the request to the school official was, and to find the rest of the respondent's testimony credible and not to require corroboration for all the other incidents that happened seems inconsistent, and to me seems to be clear error on her part. So it looks like I'm out of time. Thank you very much. Thank you very much. Thank you to both counsel for helpful arguments. We'll take the matter under advisement.